[Cite as *State v. Washington*, 2015-Ohio-4982.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

### JOURNAL ENTRY AND OPINION
### Nos. 102337 and 102338

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## BRIAN WASHINGTON

DEFENDANT-APPELLANT

## JUDGMENT:
## AFFIRMED IN PART,
## DISMISSED IN PART

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case Nos. CR-14-585919-B and CR-10-542057-B

**BEFORE:**    Blackmon, J., Jones, P.J., and Stewart, J.

**RELEASED AND JOURNALIZED:**    December 3, 2015

**ATTORNEY FOR APPELLANT**

Russell S. Bensing
1360 East 9th Street
Suite 600
Cleveland, Ohio 44114

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

By: Callista R. Plemel
Assistant County Prosecutor
8th Floor Justice Center
1200 Ontario Street
Cleveland, Ohio 44113

PATRICIA ANN BLACKMON, J.:

{¶1} Brian Washington appeals his drug trafficking and drug possession convictions and assigns the following errors for our review:

I. The trial court erred and abused its discretion in admitting opinion evidence of Defendant's guilt, in derogation of Defendant's right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution.

II. The trial court erred by failing to grant a judgment of acquittal, pursuant to Crim.R. 29(A), on the charges of drug trafficking and drug possession, and thereafter entering a judgment of conviction of those offenses, which was not supported by sufficient evidence, in derogation of Defendant's right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution.

III. The trial court erred by entering judgments of conviction of drug trafficking and drug possession that were against the manifest weight of the evidence, in derogation of Defendant's right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution.

{¶2} Having reviewed the record and pertinent law, we affirm Washington's convictions in 8th Dist. Cuyahoga No. 102337, and we dismiss 8th Dist. Cuyahoga No. 102338. The apposite facts follow.

{¶3} At approximately 2:30 a.m. on May 26, 2014, Cleveland Police Lieutenant Louis Pipoly was driving an unmarked detective car in the area of East 117th Street and St. Clair Avenue, in Cleveland, investigating multiple gang-related shootings. Three other police officers, Detectives Jon Periandri, Brian Middaugh, and Michael Schroeder, were in the car with Lt. Pipoly when two males approached the vehicle, waving them

down. One of these males was Washington, and he yelled to the undercover officers, "What you guys need, what you need?" Det. Schroeder told Washington, "Hey, I need a 60." Washington and the other male, later identified as codefendant Kynan Sterns, continued to approach the vehicle at a hurried pace, with Washington responding to Det. Schroeder by saying, "I got it. I got you." The officers jumped out of the car before the two males realized that they were approaching a car full of police officers. The males attempted to run, but they were taken into custody at the scene.

{¶4} The police also apprehended codefendant Dionte Shephard, who was getting into a vehicle parked at the Marathon gas station on the corner of E. 117th Street and St. Clair Avenue. The police recovered 2.96 grams of crack-cocaine from the glove box of the car and two cell phones and $282.00 cash from Shephard.

{¶5} On June 2, 2014, Washington, Sterns, and Shephard were charged with two counts of drug trafficking and one count of drug possession. Shephard was additionally charged with possessing criminal tools. Washington's case was tried to a jury. The court granted judgment of acquittal on one count of drug trafficking. On October 10, 2014, the jury found Washington guilty of drug trafficking in violation of R.C. 2925.03(A)(1) and drug possession in violation of R.C. 2925.11(A), both fifth-degree felonies.

{¶6} On November 13, 2014, the court sentenced Washington in the instant case and two other community control sanctions violation cases, Cuyahoga C.P. Nos.

CR-10-535298 and CR-10-542057. The court sentenced Washington to an aggregate prison term of three years.

{¶7} Washington appealed this drug related case, which was assigned Appeal No. 102337, and CR-10-542057, which was assigned Appeal No. 102338. Washington's two appeals were consolidated. However, Washington filed one appellate brief, and all three of his assigned errors relate to his convictions for drug trafficking and drug possession in Appeal No. 102337. Washington makes no argument that the trial court erred regarding his community control sanctions violation conviction and sentence in Case No. CR-10-542057. Therefore, Appeal No. 102338 is dismissed for failure to comply with App.R. 16(A). *See also* App.R. 3(A); App.R. 18(C); *State v. Helmstetter*, 3d Dist. Auglaize Nos. 2-13-07 and 2-13-08, 2013-Ohio-3982.

## Opinion Evidence

{¶8} In his first assigned error, Washington argues that the trial court erred by admitting various police officers' testimony as to why they believed Washington was offering to sell them drugs despite having no drugs on his person at the time.

{¶9} "The trial court has broad discretion in the admission of evidence, and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, an appellate court should not disturb the decision of the trial court" regarding the admissibility of evidence. *State v. Issa*, 93 Ohio St.3d 49, 65, 752 N.E.2d 904 (2001).

{¶10} Pursuant to Evid.R. 701, a lay "witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the

perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Furthermore, "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact." Evid.R. 704.

{¶11} In *State v. Wilkinson*, 8th Dist. Cuyahoga No. 100859, 2014-Ohio-5791, ¶ 52, this court held that police officers' opinion testimony concerning a "middleman's" role in drug transactions was admissible when it "was based on their training and experience with narcotics arrests and their personal observations with the investigation and controlled delivery of the parcel."

{¶12} In the case at hand, the four detectives testified that they had each been involved in hundreds to thousands of arrests related to drug offenses. Asked about the area of the corner of E. 117th Street and St. Clair Avenue, Lt. Pipoly testified that he "would definitely categorize it as a high drug area because of the amount of arrests we have made there." As to the events that occurred in the early morning hours of May 26, 2014, when the police officers were driving through that area, Lt. Pipoly testified as follows:

> I observed two guys over here. They kind of see us. They start to wave us down. * * * They're coming at us. We're seated in the car. We all have * * * bullet vests, * * * radios * * *, flashlights. I pull up farther so these guys are looking directly at us. I think they're going to try and sell us drugs. The one male later identified as Brian Washington is yelling, What you guys need, what you need? * * * Det. Schroeder was like, Hey, I need a 60. * * * For 60, you're looking for a couple pieces of crack cocaine.

**{¶13}** Lt. Pipoly testified that in response to Det. Schroeder, Washington said, "I got it. I got you."

**{¶14}** According to Lt. Pipoly, Washington and Sterns were

> running up to the car. * * * They're coming almost — seemed like the two of them are [in] some kind of crazy competition to get to the car first. Once they get to the car, the gig is up. There is no way we're going to complete the transaction. Once they get up there, they're looking into the car, all they're going to see is police radios, guns and police dispatch this big written across our chests. We all jump out of the car. Both males turn around and start to run down the path back toward the Marathon. The chase lasted about 3½ seconds, 2 seconds. We have got them both in custody here.

**{¶15}** Asked if it "was common for people to sell drugs without the drugs on their person," Lt. Pipoly testified as follows:

> It's very common in * * * higher drug activity areas. We call it middling a deal. There [are] a lot of people that have drug use problems that are looking to make a little money. They will come out. They will approach vehicles, What do you need, anything like this. They don't get robbed because they have nothing on them. When they get arrested by zone cars, they have no drugs on them. All they do is take the users' money, run to the house or run to whoever they're working with who is parked nearby or in an apartment building next door, run in there, [get] the drugs, and they will do it for a small amount of profit or they will break a small piece of the rock off and keep that for their own consumption and then give the remainder to the drug user.

**{¶16}** Asked why he believed that Washington "was offering to sell narcotics" on May 26, 2014, Lt. Pipoly testified that, in looking at:

> the totality of the circumstances, you have a gas station in a high drug trafficking area, it's 2:30 in the morning, Mr. Washington isn't inside buying anything, he is standing in front of a gas station, he doesn't have a vehicle there, we come driving across the street, he is waving to us, hey, what do you need, what else could he possibly be asking me? It doesn't make any sense why you're going to run up to a car with 4 guys in it.

{¶17} The three other Cleveland Police Detectives testified similarly, explaining why they believed Washington was attempting to sell drugs as a "middleman."

{¶18} For example, asked what it meant if "someone is flagging you down" at 2:30 a.m. in the area of E. 117th Street and St. Clair Avenue, Det. Periandri testified that "[i]t usually means some type of narcotics transaction."   Asked about the events that occurred in this area on May 26, 2014, Det. Periandri testified as follows:

> [Two] individuals run up.  They flag us down.  We start talking.  I say, These guys don't realize they're getting ready to sell or middle a deal with us. * * * Cellphones have changed the drug game so much. * * * You will have a lookout, you will have one guy holding the money, one guy holding the drugs.
>
> Q:   After they flag you down, then what is the next thing that occurs?
> A:   As they get up on us, they're using some street terminology, what you need, what you want. * * * That's when Schroeder yells, I got a 60 or something along the lines of a 60.
>
> Q:   What does that mean?
>
> A:   That he wanted to purchase $60 worth of cocaine.
>
> Q:   Is that a common reference to use?
>
> A:   Yeah.  It goes back to the testimony you guys heard before.  No one ever says, Hey, do you have cocaine, or, Hey, do you have weed?  It's all street slang, all terminology.
>
> * * *
>
> Q:   In all your training and experience and these types of arrests and situations, throughout your training and experience with drug arrests and street level sales, what would be Mr. Washington's role?
>
> * * *

A: He was middling the deal. He was the middleman. He gets either — like the testimony heard yesterday, he gets a cut of the money or a cut of the product, possibly both.

Q: Is that why Mr. Washington was placed under arrest?

A: Correct.

{¶19} Additionally, Det. Middaugh testified that, based on his training and experience, there are people who "run" the drugs for the dealers. "The middleman would be so that the main drug dealer, the source of the narcotics, would never have to handle the drugs or do a hand-to-hand transaction himself. Sometimes there [are] several middlemen. Sometimes there [are] lookouts with middlemen."

{¶20} Det. Schroeder's testimony about middlemen went as follows:

A: Drug dealers will have middlemen that work for them. They will give them a little bit of drugs and sometimes they work on credit, sometimes these people are users themselves and they will pay them in drugs to sell drugs for them and then they return the money back to the main guy.

Q: This is a common occurrence in drug activity?

A: Yes.

Q: Is that what you believe was going on in this particular situation?

* * *

A: Yes.

{¶21} Asked, "when you're telling somebody, presumably a seller, Can I get a 60 or an 80, do you have to explain anything else for them to know what you mean," Det. Schroeder testified as follows: "No. They want you to keep it short. I mean, that's how the drug game works. You don't talk actual drugs * * *. There [are] code

words you use, and it's — they know exactly what you mean when you say a 60 or an 80 or a 20."

{¶22} In applying Evid.R. 701 and 704, we find that this testimony was based on the perception of the witnesses and was helpful to explain the "slang" used to buy and sell small quantities of drugs on the streets, as well as the role of a "middleman." Accordingly, we find no abuse of discretion in the admission of this testimony, and Washington's first assigned error is overruled.

## Sufficiency of the Evidence

{¶23} In his second assigned error, Washington argues that, because no drugs or criminal tools were found on his person, the officers' testimony that his actions were consistent with a middleman in a drug transaction amounted to a mere inference that was insufficient to establish guilt.

{¶24} Crim.R. 29 mandates that the trial court issue a judgment of acquittal where the prosecution's evidence is insufficient to sustain a conviction for the offense. *Cleveland v. Pate*, 8th Dist. Cuyahoga No. 99321, 2013-Ohio-5571. Crim.R. 29(A) and a sufficiency of the evidence review require the same analysis. *State v. Mitchell*, 8th Dist. Cuyahoga No. 95095, 2011-Ohio-1241, citing *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386. "A challenge to the sufficiency of the evidence supporting a conviction requires the court to determine whether the prosecution has met its burden of production at trial." *State v. Givan*, 8th Dist. Cuyahoga No. 94609,

2011-Ohio-100, ¶ 13, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997).

{¶25} The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Vickers*, 8th Dist. Cuyahoga No. 97365, 2013-Ohio-1337, citing *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991).

{¶26} Washington was convicted of drug trafficking in violation of R.C. 2925.03(A)(1), which states that "[n]o person shall knowingly * * * [s]ell or offer to sell a controlled substance * * *" and drug possession in violation of R.C. 2925.11(A), which states that "[n]o person shall knowingly obtain, possess, or use a controlled substance * * *." Although not specifically argued on appeal, we note that drug possession may be actual or constructive. "[C]ircumstantial evidence is sufficient to support the element of constructive possession, * * * [which] requires some evidence that the person exercised or has the power to exercise dominion or control over the object, even though the object may not be within his immediate physical possession." *State v. Smith*, 8th Dist. Cuyahoga No. 96348, 2011-Ohio-6466, ¶ 52.

{¶27} Given the four detectives' testimony that middlemen are often used in street level drug transactions in high drug activity areas, we find that the state presented sufficient evidence to meet the elements of drug trafficking and drug possession in relation to Washington, and his second assigned error is overruled.

**Manifest Weight of the Evidence**

{¶28} In his third and final assigned error, Washington argues that "the jury's verdict was based upon the declarations of the detectives that * * * Washington was indeed trafficking in drugs, despite the clear lack of evidence to support that allegation."

{¶29} In *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, the Ohio Supreme Court addressed the standard of review for a criminal manifest weight challenge, as follows:

> The criminal manifest-weight-of-the-evidence standard was explained in *State v. Thompkins* (1997), 78 Ohio St.3d 380, 1997 Ohio 52, 678 N.E.2d 541. In *Thompkins*, the court distinguished between sufficiency of the evidence and manifest weight of the evidence, finding that these concepts differ both qualitatively and quantitatively. *Id.* at 386, 678 N.E.2d 541. The court held that sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, but weight of the evidence addresses the evidence's effect of inducing belief. *Id.* at 386-387, 678 N.E.2d 541. In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's? We went on to hold that although there may be sufficient evidence to support a judgment, it could nevertheless be against the manifest weight of the evidence. *Id.* at 387, 678 N.E.2d 541. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.* at 387, 678 N.E.2d 541, citing *Tibbs v. Florida* (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652.

{¶30} An appellate court may not merely substitute its view for that of the jury, but must find that "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387. Accordingly, reversal on manifest weight grounds

is reserved for "the exceptional case that the evidence weighs heavily against the conviction." *Id.*

**{¶31}** In the case at hand, all four detectives testified that they were in an unmarked police vehicle in the area of E. 117th Street and St. Clair Avenue, when two males approached their car, waving them down. Det. Middaugh testified that "[b]ased on my training and experience if you're being waved down, you're only being waved down for 2 reasons in this type of area, it's either narcotics or prostitution. I'm sure it wasn't prostitution." According to Det. Middaugh, he and the other police officers were "immediately alerted without a doubt" that they were being offered narcotics for sale and were "almost in shock because we were in full uniform * * *."

**{¶32}** All four detectives also testified that as the two males approached the car, Washington asked, "What you need?" Det. Middaugh testified that, based on his training and experience, "What you need is what kind of narcotics do you need." Det. Middaugh continued and stated, however, that "[t]hey could have said absolutely nothing at all just by the fact that they're flagging us down. Based on my training and experience, they want to sell me drugs. * * * People don't yell, Hey I have heroine [sic], hey I have crack cocaine."

**{¶33}** Det. Middaugh further testified that "in this area next to a gas station I would say the crack cocaine would be the most obvious drug, and you would just respond with a number, which basically means how much. * * * The number signifies — a 20 piece would be like one rock of crack cocaine."

**{¶34}** Det. Schroeder testified about his recollection of the interaction on the night in question:

> We were in the area of 117th and St. Clair. When I'm sitting in the back seat, I observed somebody flagging me down. It's 2:35 in the morning. There [are] 4 of us in the car. At that point, through my experience, I realize that they're flagging me down for some sort of narcotic purchase or some sort of illegal activity. So at that point I ask — they say, What you need. Mr. Washington asks me what I need. I said, What you got? I waved him to come closer. They're in a field. * * * I wave them to come closer. Like I said, we're all in our tactical vests at this point. I know that I don't — once they get up on us, they're going to know we're the police.

> At that point I tell them I want a 60. [Washington] makes some kind of reference of I can't remember what he said, come on, I got you, come on, and at that point I knew what we were purchasing. * * * At that point I knew, you know, that he was going to sell us or he was going to take us somewhere to sell us crack cocaine.

**{¶35}** According to Det. Schroeder, Washington and Sterns were approximately "15 to 20 feet away" from the unmarked police vehicle when this conversation took place. Asked what he thought was "going on" after this interaction, Det. Schroeder testified that "I knew it was some sort of illegal activity like narcotics just through my experience with purchasing and being around [confidential informants] making purchases." Asked what he was referring to when he said, "60," Det. Schroeder stated "I'm referring to crack cocaine at that point."

**{¶36}** Washington argues that the police report in the instant case, which was written by Det. Periandri, "was at odds" with the detectives' trial testimony in two areas. First, the report allegedly stated that only Sterns was waving his arms in the air. Second,

the report allegedly "made no mention of * * * Washington saying anything in response to Det. Schroder's stating 'I need a 60.'"

**{¶37}** Upon review, we find that the police report was not admitted into evidence in the trial court and is not part of the record on appeal. Nonetheless, we conclude that all four detectives testified consistently at trial and the minor alleged discrepancies between this testimony and a police report do not weigh heavily in favor of acquittal. *See State v. Hartford*, 21 Ohio App.3d 29, 31, 486 N.E.2d 131 (8th Dist.1984) ("some details omitted from a witness statement may naturally crop up for the first time at trial, and it is not appropriate to consider the omission of such details to be 'inconsistencies'").

**{¶38}** Accordingly, we cannot say that the jury lost its way in convicting Washington of drug trafficking and drug possession, and his third assigned error is overruled.

**{¶39}** Judgment affirmed in Appeal No. 102337. Appeal No. 102338 is dismissed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
PATRICIA ANN BLACKMON, JUDGE

LARRY A. JONES, SR., P.J., and
MELODY J. STEWART, J., CONCUR